Filed 2/24/15  P. v. Montes CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE MARIA MONTES,<br><br>    Defendant and Appellant. | G049413<br><br>(Super. Ct. No. 12CF2042)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Franciso P. Briseno, Judge.  Affirmed.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Jose Maria Montes of committing a lewd act (count 1) and sodomy (count 2) with a child under 10. (Pen. Code, §§ 288, subd. (a), 288.7, subd. (a); all further statutory references are to the Penal Code.) The court sentenced defendant to an indeterminate term of 25 years to life on count 2, plus a concurrent six-year sentence on count 1.

Defendant claims prosecutorial misconduct during closing argument, ineffective assistance of counsel, and sentencing error. These claims are meritless and we affirm the judgment.

## FACTS

In early 2010, Maria D., her husband, Ramon M., and Jose C., Maria's then eight-year-old son, moved from El Salvador to a one-bedroom apartment in Santa Ana. In October 2010, Ramon invited defendant to live with them. Maria, Ramon, and Jose shared the bedroom and defendant slept on a couch in the living room. On occasion, Maria and Ramon left Jose with defendant. Jose sometimes told Maria he did not like defendant.

The household arrangement with defendant held until 2012. Then, in late June 2012, Maria started working from 1:30 p.m. to 10:30 p.m. Ramon worked from 2:00 p.m. to 11:30 p.m. Although one of the neighbors had primary childcare responsibility for Jose while his parents worked, Maria and Ramon occasionally asked defendant to fulfill this role.

At the end of June, Ramon left the United States to vacation in El Salvador. A few days later, July 2, Maria left Jose home with defendant while she went to work. Jose testified that after his mother left for work, he decided to watch television. He threw a cushion on the floor in front of the television and sat down. Jose was wearing sleeping shorts, underwear, and a top.

A few minutes later, defendant came out of the bathroom and asked Jose if he wanted a massage. Jose said, no but defendant touched him anyway. Defendant,

2

much larger and heavier than Jose, held Jose down and touched Jose's penis and body. Jose tried to move away, but defendant had him pinned. As defendant held Jose down, he also kissed and licked Jose's mouth, face, and belly button. Defendant took off Jose's clothes and threw them on the floor. Defendant pulled out his penis and put it in Jose's anus. Defendant ejaculated and then got up to go to the bathroom. Jose wiped his anus with his underwear, put on his clothes, and ran into the bedroom.

When Maria returned home, Jose was crying in the bedroom. Maria asked Jose what happened, and Jose said defendant raped him. Jose gave Maria his underwear. Maria saw what looked like semen. She and Jose locked the door to their bedroom and did not come out until the next morning.

Maria left Jose with her neighbor when she went to work the following day, July 3. She also called Ramon and Jose's godfather to ask advice on whether to call the police. Both of them told Maria to call the police.

The following morning, July 4, Maria contacted the police. Crime scene investigators came to her home and collected Jose's underwear. A forensic scientist found semen on Jose's underwear and collected a DNA sample. The forensic scientist compared this sample with defendant's DNA sample. At trial, the forensic scientist testified there was a less than one in one trillion chance the DNA found on Jose's underwear was not from defendant. Although Jose was subjected to a sexual assault examination, the examiner saw no external injuries and could neither confirm nor negate Jose's claim of sexual abuse.

Defendant was arrested two days later. He waived his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436) and agreed to be interviewed by police. Defendant told the officers he took care of Jose on July 2 when Maria went to work. At one point during the day, defendant said he noticed Jose was doing leg exercises on the floor. Defendant said he started to help Jose do his exercises and tickled Jose. Initially, defendant denied putting his mouth on Jose's body. Later, he admitted putting a finger

3

and his tongue in Jose's mouth, and putting his mouth near Jose's navel. Defendant denied having sex with Jose. He also denied showing Jose his penis.

A few days later, a Child Abuse Services Team (CAST) worker and a police detective interviewed Jose. Jose told the CAST worker that he had been lying on the floor watching television when defendant, who had been in the room with him, got up to go to the bathroom. When defendant came out of the bathroom, he grabbed Jose's legs, pulled them apart, touched and kissed him, and put his hand on Jose's penis. Jose said defendant kissed his face and belly button and pulled Jose's hair. Defendant stuck his penis through his pants fly and pushed it into Jose's anus. Jose said "something sticky" came out of defendant's penis. He also heard defendant moan and say, "I love you." Defendant removed his penis, and then cleaned himself before Jose's mother came home.

## DISCUSSION

*1. Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct during closing argument by misstating the People's burden of proof. To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1358; *People v. Souza* (2012) 54 Cal.4th 90, 122.) Here, defendant never objected at trial to any of the comments he now asserts were improper, and nothing in the record suggests an objection would have been futile, or an admonition inadequate to cure any harm. Accordingly, defendant's claims of prosecutorial misconduct have been forfeited. (*People v. Tully* (2012) 54 Cal.4th 952, 1011.)

Defendant acknowledges as much. Nevertheless, we address the merits of defendant's prosecutorial misconduct claim in light of defendant's alternative claim that his trial counsel's failure to object constituted ineffective assistance of counsel.

4

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Farnam* (2002) 28 Cal.4th 107, 167; *People v. Wilson* (2005) 36 Cal.4th 309, 337 (*Wilson*); *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

On appeal, the reviewing court considers the challenged statements in context, and in consideration of the argument as a whole. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) The court does not lightly infer that the jury drew the most damaging meaning from the prosecutor's statements. (*People v. Shazier* (2014) 60 Cal.4th 109, 144; *People v. Dykes* (2009) 46 Cal.4th 731, 771-772.) Here, defendant provides no compelling reason to conclude the worst.

About midway through her closing argument, the prosecutor stated, "So what's the job of the juror? The job of a juror . . . is to find out what the facts are, what happened in this case, to be a judge of the credibility of witnesses. You look at the law . . . you look at the facts and . . . you put those together, and then you come to a decision . . . ." She also told the jury to use their common sense and life experiences in reaching a verdict.

Then, as a way to further illustrate the point, the prosecutor observed, "I'd like to talk a little bit about what the job of a juror is not. It's not to speculate or to investigate. You don't go home and do experiments or anything like that. You don't look up on the internet . . . don't take into consideration sympathy or prejudice . . . don't consider punishment or consequences . . . . [¶] *It's not a search for doubt*. . . . As you sit here today, right now, you probably have questions about the case that weren't answered by the testimony, and that's okay." (Italics added.)

5

Defendant argues the above-italicized language is a mischaracterization of the prosecution's burden of proof and proof of misconduct. We disagree. "'"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.]" (*Wilson*, *supra*, 36 Cal.4th at p. 337.) Here, defendant fails to meet the burden to show the jury misunderstood, misconstrued, or misapplied the prosecutor's statements concerning the burden of proof.

According to the jury instruction given here, "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt." The prosecutor's comment that a trial is "not a search for doubt," while perhaps inartful, correctly told the jury to focus on the evidence presented at trial and to not speculate about evidence or witnesses neither party presented. (See also CALCRIM Nos. 1.00 [duties judge and jury], 1.03 [no independent investigation], 2.11 [no requirement to produce all evidence].) We conclude the prosecutor committed no misconduct. There was no violation of defendant's state or federal constitutional rights, and no basis for reversal of the judgment.

### 2. *Ineffective Assistance of Counsel*

As noted, defendant claims his trial attorney provided prejudicial ineffective assistance of counsel by failing to object to the prosecutor's characterization of the burden of proof. Because the prosecutor did not misstate the burden of proof, it is axiomatic counsel had no basis for objection. "'Trial counsel is not required to make futile objections, advance meritless arguments or undertake useless procedural challenges merely to create a record impregnable to assault for claimed inadequacy of counsel. [Citation.]'" (*People v. Stratton* (1988) 205 Cal.App.3d 87, 97, quoting *People v. Jones* (1979) 96 Cal.App.3d 820, 827.) Thus, defendant's ineffective assistance of counsel based on counsel's failure to object to the prosecutor's characterization of the burden of proof also fails.

## 3. Section 654

Section 654 states, in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "[T]he purpose of section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.'" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.)

In this case, the court imposed an indeterminate term on count 2 and a concurrent determinate term of six years on count 1. Defendant contends the sodomy formed the basis for both counts, consequently, he has been punished twice for the same act in violation of section 654. Not so.

During closing argument, the prosecutor said count 1 was based on "the touching that occurs between the defendant and Jose . . . prior to any penetration of Jose . . . by the defendant. . . . That's the touching that we are talking about for this crime for count number 1. That's the [section] 288 [subdivision] (a)." She then stated, "[t]he second crime he's been charged with is [section] 288.7, and that's sodomy with a child ten or younger. The date of violation is the same [as the section 288]. It's the penetration that occurs after the touching on the same day, and that's obviously the same victim, Jose. . . . Thus, the prosecutor clearly delineated which facts were being relied on to prove each count.

Defendant counters that because the court gave CALJIC No. 17.01, a unanimity instruction, the jury might have used the sodomy to support their verdict on both counts. This is wild speculation, given that application of the unanimity instruction was specifically limited to count 1. As the court instructed the jury: "The defendant is accused of having committed the crime of lewd act on a child under 14 years of age as charged in count 1. The prosecution has introduced evidence for the purpose of showing that there is more than one act upon which a conviction on Count 1 may be based.

Defendant may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of the acts. However, to return a verdict of guilty on Count 1 or a lesser offense of attempted lewd act on a child, all jurors must agree that he committed the same act."

With specific reliance by the prosecutor on any one of several lewd acts, exclusive of the sodomy, and the instruction directing the jury on how to consider evidence of multiple acts with respect to count 1, there is no reasonable likelihood the jury misunderstood both and used the sodomy to form the basis of both their guilty verdicts. Thus, the court did not violate section 654 by imposition of a concurrent six-year term for count 1.

### DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


FYBEL, J.

8